Bradbury, J.
These actions are brought under the fourth clause of sec. 6761, Revised Statutes, which authorizes an action of quo warranto to be brought against a corporation “ when it has misued a franchise, privilege or right conferred upon it by law, or when it claims or holds by contract or otherwise, or has exercised a franchise, privilege or right in contravention of law.”
The petitions charge, among .oth iv things, that the defendants misused their corporate powers and franchises by dis-criminating in their rates of freight in favor of certain refiners of petroleum oil connected with, the Standard Oil *135 Company, by charging other shippers of like products unreasonable rates, by arbitrarily and suddenly changing the same, and, finally, by confederating with the favored shippern to create and foster a monopoly in refined oil, to the injury of other refiners and the public; and farther, that the defendants claimed and exercised, in contravention of law, the right to charge, for shipping oil in tank cars, a lower rate of freight per hundred pounds than they charged for shipping the same in barrels, in carload lots. The defendants by answer, among other matters, denied charging any shippers unreasonable rates of freight, or that they arbitrarily or suddenly changed such rates, and denied any confederacy with any one to establish a monopoly.
The actions were referred to a .referee to take the evidence and to report to this court his findings of fact and conclusions of law therefrom; all which has been done and the cases are before us upon this report.
To the report of the referee exceptions were filed by all parties. The defendants, however, do not now insist upon their exceptions to the finding of the referee in so far as it relates to the facts; indeed, it is difficult to conceive any grounds for their doing so, for these findings are mainly based upon the testimony of the officers and agents of the railroad companies.
On the other hand, however, counsel for the relators urge upon us with much force their exceptions to the facts as they were found by the referee; four of which findings at least — the eighth, ninth, twenty-second and twenty-third— deserve consideration. The eighth was, that the open rate of freight made for the public for oil was not excessive, and the ninth, that those open rates were not frequently or arbitrarily changed. Without absolutely committing ourselves to the correctness of these findings, we think they are made immaterial by other findings that require the rendition of the same judgment tháh- should have been rendered had these two findings been the reverse of what they are.
The twenty-second and twenty-third findings of fact should be considered together. The first of the two nega *136 tives the existence of a conspiracy, or confederation, between either of the defendants and The Camden Consolidated Oil Company on the one hand, or Tire Chess-Carly Company on the other, to foster or create a monopoly in the traffic in petroleum oil, while the other one rests the action of the railroad companies, in giving rebates and special rates to these favored shippers, upon the necessity they were under of doing so to secure large shipments of oil over their roads, which would otherwise have been lost to them.
It is contended in this connection, that as the evidence shows, and the referee in. another part of his report found, that this action of the railroad companies tended to create a monopoly and to injure the business of George Rice in all the markets reached by their lines, and in some instances did in fact create a monopoly, they, (especially as their officers were men of large capacity and wide experience in the affairs of the commercial world,) must be held to have contemplated and intended these natural results. It is true that in relation to many matters, both civil and criminal, one must be held to intend the natural and probable consequences of an acjt and cannot be heard to deny it. We think the principle hardly applicable here, and that the charge of an actual conspiracy by the defendants with others, to misuse the franchises conferred on them by the state, to injure the. public, is not necessarily sustained by proof that a course was pursued beneficial to their interests, though it tended to, and in fact did, produce that result. The inference thus arising is to be given due force, but is not conclusive; and the fact of conspiracy is to be established, if at all, from a consideration of all the circumstances in the case; and we cannot say, in view of all those circumstances, that the finding of the referee in this respect is not supported by the evidence. The exceptions to the report. are, therefore, overruled.
All of the oil of The Camden Consolidated Oil Company that was transported over The Cincinnati, Washington & Baltimore Railway, all of that which was refined by George Rice and other refiners operating at Marietta, Ohio, which *137 was carried south of the Ohio river, and all of that belonging to any of those parties which was transported over 'the Cincinnati, New Orleans & Texas Pacific Railway, was commerce between the states, the regulation of which, by the constitution of the United States, is denied to the several states; and as the discrimination, of which complaint is made in this action, relates to this traffic, defendant’s counsel contend that this court has no jurisdiction of the subject. No doubt the regulation of inter-state commerce belongs exclusively to the national government. But does the controversy now before us, in any proper sense of the term, relate to a regulation of commerce between the states ? Does this exclusive right in congress to regulate inter-state commerce, preclude any action by a state upon any subject that may incidentally affect such commerce ? Certainly a state cannot be compelled to create corporations in aid of, or to facilitate, commerce between the states; but if it does create one capable of engaging in such commerce, and the corporation in fact so engages, is that an emancipation of the corporation from the control of the state ? That the power to regulate commerce between the states, cannot safely be pressed to such extreme consequences is, we think, recognized by the Supreme Court in Robbins v. Shelby County Taxing District, 120 U. S. 489. The corporation has received vitality from the state; -it continues during its existence to be the creature of the state; must live subservient to its laws, and has such powers and franchises as those laws have bestowed upon it, and none others. As the state was not bound to create it in the first place, it is not bound to maintain it, after having done so, if it violates the laws or public policy of the state, or misuses its franchises to oppress the citizens thereof.
For such offenses the state, acting through its legislature and courts, and in the exercise of a sound discretion, may either destroy the corporation entirely, by forfeiting its charter, or oust it from the wrongful exercise of its powers. And if, instead of, or in addition to misusing the franchises actually conferred, it usurps others, the circumstance that the usurped franchises relate to and concern commerce *138 between the states, ought not to deprive the state of its visitorial power. If the state creating the corporation is deprived of this power, none exists elsewhere. “ The government creating the corporation can alone institute such a proceeding; ” (quo warranto to adjudge forfeiture of a corporate franchise;) “ since it may waive a broken condition of a compact made with, it.” Angel & Ames on Corp., sec. 777, and cases cited. See note 6.
That The Cincinnati, Washington & Baltimore Railway Company did discriminate in its rates for freight on petroleum oil in favor of The Camden Consolidated Oil Company, and that The Cincinnati, New Orleans & Texas Pacific Railway Company did the same in favor of The Chess-Carly Company, is shown by the finding of the referee, which is clearly sustained by the evidence. That these discriminating rates were in some instances strikingly excessive, tended to foster a monopoly, tended to injure the competitors of the favored shippers and were in many instances prohibitory, actually excluding these competitors from extensive and valuable markets for their oil, giving to the favored shippers absolute control thereof, is established beyond any serious controversy. The justification interposed is that this was not done pursuant to any confederacy with the favored shipper or with any purpose to inflict injury on their competitors, but in order that the railroad companies might secure freight that would oth&swise have been lost to them. This we do not think sufficient. We are not unmindful of the difficulties that stand in the way of prescribing a line of duty to a railway company, nor do we undertake to say they may not pursue their legitimate objects, and shape their policy to secure benefits to themselves, though it may press severely upon the interests of others; but we do hold that they cannot be permitted to foster or create a monopoly, by giving to a favored shipper a discriminating rate of freight. As common carriers, their duty is to jcarry indifferently for all who may apply, and in the order in which the application is made and upon the same terms; and the assumption of a right to make discriminations in rates for freight, such as was claimed and exercised by the defend *139 ants in this case, on the ground that it thereby secured» freight that it would otherwise lose, is a misuse of the rights j and privileges conferred upon it by law. A full and complete discussion of the principles and a thorough collection of the authorities, bearing upon the duties of railroad companies toward their customers, is to be found in the opinion of Atherton, J., in the case of Scofield v. Railway, 43 Ohio St. 571, to which nothing need be now added.
It appears that of the two methods of shipping oil, that by the barrel in car load lots and that in tank ears, the first o»rly was available to George Rice and the other refiners of petroleum oil at Marietta, Ohio, as they owned no tank cars, nor did the defendants own or undertake to provide any; but that both methods were open to The Camden Consolidated Oil Company and The Chess-Carly Company, by reason of their ownership of tank cars, and that the rate per barrel in tank cars was very much lower than in barrel packages in box ears; that in fact The Cincinnati, Washington & Baltimore Railway Company after allowing The Camden Consolidated Oil Company a rebate, and allowing The Baltimore & Ohio Railway Company for switching cars, received from The Camden Consolidated Oil Company only about one half the open rates it charged the Marietta refiners, and that both railroad companies claimed the right to make different rates, based upon the different methods of shipping oil, and the fact of the ownership by shippers of the tank ears used by them. It was the duty of the defendants to furnish suitable vehicles for transporting freight offered to them for that purpose, and to offer equal terms to all shippers. A railroad is an improved highway; the public are equally entitled to its use; it must provide equal accommodation for all upon the same terms. The fact that one shipper may be provided with vehicles of his own, entitles him to no advantage over his competitor not so provided. The true rule is announced by the Interstate Commerce Commission, in the report of the case of George Rice v. The Louisville & Nashville Railroad Company et al.
“ The fact that the owner supplies the rolling stock when his „ oil is shipped in tanks, in our opinion, is entitled to little *140 weight when rates are under consideration. It is properly the business of railroad companies to supply to tlieir customers suitable vehicles of transportation (Railroad Co. v. Bratt, 32 Wall. 123), and then offer their use to everybody impartially.” Page 50 of the report of the case. No doubt a shipper who owns cars may be paid a reasonable compensation for the use, so that the compensation is not made a cover for discriminating rates, or other advantages to such owner as a shipper. Nor is there any valid objection to such owner using them exclusively, as long as the carrier provides equal accommodations to its other customers. It may be claimed that if a railroad company permit all shippers indifferently, and upon equal terms, to provide cars suitable for their business, and to use them exclusively, no discrimination is made. This may be theoretically true, but is not so in its application to the actual state of the business of the country; for a very large portion of the customers of a railroad have not a volume of business large enough to warrant equipping themselves with cars, and might be put at a ruinous disadvantage in the attempt to compete with more extensive establishments. Aside from this, however, a shipper is not bound to provide a car; the duty of providing suitable facilities for its customers rests upon the railroad company, and if, instead of providing sufficient and suitable cars itself, this is done by certain of its customers, even for their own convenience, yet, the cars thus provided are to be regarded as part of the equipment of the road. If being the duty of a railroad company to transport freight for all persons indifferently and in the order in which its transportation is applied for, it cannot be permitted to suffer freight cars to be placed upon its track by any customer for ! his private use, except upon the condition that, if -it does not .provide other cars sufficient to transport the freight of other [customers in the order that application is made, they may be used for that purpose. .Were this not so, a mode of discrimination, fatal to all successful competition by small establishments and operators with large and more opulent ones, could be successfully adopted and practiced at the will of the railroad company and the favored shipper.
*141 The advantages, if any, to the carrier, presented by the tank car method of transporting oil, over that by barrels in box cars in car load lots, are not sufficient to justify any substantial difference in the rate of freight for oil transported in that way; but if there were any such advantages, as it is the duty of the carrier to furnish proper vehicles for transporting it, if it failed in this duty it could not in justice avail itself of its own neglect as a ground of discrimination. It must either provide tank cars for all of its customers alike, or give such rates of freight in barrel packages, by the car load, as will place its customers using that method, on an equal footing with its customers adopting the other method.

Judgment ousting defendants from the right to make or charge a rate of freight per hundred pounds for transporting oil in iron tank ears, substantially lower than for transporting it in barrels, in car load lots.